**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | |
|---|---|
| **KARLA KEMMET,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | )   **Case no. 1:16CV34 PLC** |
| | ) |
| **NANCY A. BERRYHILL,[1]** | ) |
| **Acting Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM AND ORDER

Plaintiff Karla Kemmett seeks review of the decision of Social Security Commissioner, Nancy Berryhill, denying her applications for Disability Insurance Benefits and Supplemental Security Income under the Social Security Act.[2]  The Court has reviewed the parties' briefs and the administrative record, including the hearing transcript and medical evidence.  For the reasons set forth below, the case is reversed and remanded.

### I.       *Factual and Procedural Background*

Plaintiff filed applications for Disability Insurance Benefits and Supplemental Security Income on March 25, 2013.  (Tr. 222-25, 229-36).  In her applications, Plaintiff claimed she was disabled as of September 18, 2010[3] as a result of:  seizures, bipolar disorder, depression,

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit.  No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] The parties consented to the exercise of authority by the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  (ECF No. 10).

[3] The Social Security Administration denied Plaintiff's previous applications for Social Security benefits on February 12, 2013.  (Tr. 77-92).  In the instant case, the administrative law judge found that Plaintiff had "produced no new or material evidence or other good reason to reopen

migraines, fibromyalgia, heart flutter, thyroid problems, anxiety and panic attacks, low coping skills, difficulty concentrating, dependent personality disorder, borderline personality disorder, post-traumatic stress disorder (PTSD), asthma, and hearing loss in her right ear. (Tr. 97-98). The Social Security Administration (SSA) denied Plaintiff's claims, and she filed a timely request for a hearing before an administrative law judge (ALJ). (Tr. 124, 132-33).

The SSA granted Plaintiff's request for review, and an ALJ conducted a hearing on June 26, 2014. (Tr. 40-75). At the hearing, Plaintiff testified that she was forty-two years old, had a high school diploma, and lived alone. Plaintiff stated that she worked for sixteen years as a customer service manager at Wal-Mart, and she stopped working after "back to back" seizures on September 18, 2010. (Tr. 45, 67-68). Plaintiff explained that her mother "takes care of" her medicine and confirmed that she was taking: Lamictal, Topamax, "thyroid medicines," "hormone replacement," fluoxetine, Vistaril, Flonase, Singulair, Maxalt, meloxicam, loratadine, Frova, and Abilify. (Tr. 45-47).

Plaintiff testified that she had been receiving continuous mental health care, including therapy and medicine management, for the past "three or four years[.]" (Tr. 48). She also attended a weekly support group for people with depression and bipolar disorder and was recently hospitalized for mental health problems. (Tr. 51, 54). In addition to her depression, Plaintiff described "fibro fog," and problems with her memory, concentration, and word retrieval. (Tr. 54-55). She had difficulty sleeping and, even with "sleeping medicine," only slept about three or four hours per night. (Tr. 52).

Plaintiff testified that she had not suffered a seizure in the past two years. (Tr. 48). Plaintiff continued to suffer migraines once or twice a week, and the migraines kept her in bed

---

the prior] decision," and therefore "address[ed] only the issue of whether [Plaintiff] became disabled at any time after February 12, 2013[.]" (Tr. 14).

for "at least a good two days." (Tr. 48). Depending on the severity of the migraine, Plaintiff would either go to Kniebert Clinic for "a shot" or "take a pill," alternating between Maxalt and Frova. (Tr. 49).

In regard to her fibromyalgia, Plaintiff testified "I can't lift a lot. I can't do a lot of things. I can sit a little bit then have to stand a little bit, and lay down a little bit. I just hurt all the time." (Tr. 50). Plaintiff explained that she did not take any medications specifically for her fibromyalgia because "Dr. Nagy says that it will go against my seizure medicine. About the only thing that I can take is the 800 ibuprofen," which did "[n]ot really" help. (Tr. 50-51). Plaintiff had not discussed other possibilities with her neurologist, Dr. Godbey, who treated her for seizures. (Tr. 51).

Plaintiff stated that, on a typical day, she might arise at 3:00 a.m. or 6:00 a.m., depending on her sleep the night before. (Tr. 52). Plaintiff would "sometimes" read the Bible, but not "very long because my attention span is not good," and played with her cats. (Tr. 52). Plaintiff occasionally visited her mother and had "friends that come by and check on me. . . . I'm not able to clean my house, or take care of the cats. So I'm very blessed to have my mom and friends to come by and do that for me." (Tr. 53). Plaintiff was able to sort her laundry but "somebody has to take it to the laundry room because I can't lift the baskets." (Tr. 53-54).

Plaintiff would go to the grocery store "but I always have to take my mom or somebody with me" because she could not lift or carry the groceries. (Tr. 53, 54). Plaintiff went to church twice a week. (Tr. 56). She explained that she was not able to sit for the entire service, so "once I can't sit in there anymore, I'll get up and walk around and watch the TV out there [in the vestibule]." (Tr. 55-56). In regard to exercise, Plaintiff stated: "I walk when I can, but sometimes I just hurt too bad." (Tr. 54). The heaviest thing Plaintiff was able to lift was

"[m]aybe a gallon of milk." (Tr. 56). Plaintiff did not usually nap but needed to lie down two or three times per day for thirty to ninety minutes. (Tr. 57-58). During the one-hour drive to the hearing, Plaintiff stopped three times to get out of the car, stretch her legs, and move her back. (Tr. 59). The transcript of the ALJ hearing reflected that Plaintiff also asked to stand up about mid-way through her testimony, and requested a break during the vocational expert's testimony. (Tr. 54, 71).

A psychologist, Dr. Michael Cremerius, testified as a medical expert at the hearing. (Tr. 60- 68). Based on Plaintiff's testimony and medical records, he diagnosed Plaintiff with "cognitive impairments," "depression and/or bipolar disorder," and dependent personality disorder. (Tr. 61-62). Dr. Cremerius opined that Plaintiff's impairments caused moderate limitations in activities of daily living, social functioning, and concentration, persistence, and pace. (Tr. 61-62). Dr. Cremerius noted "one period of decompensation," which was "a two-day psychiatric admission." (Tr. 62).

While Dr. Cremerius noted that Plaintiff's primary care physician described her as "profoundly symptomatic," her neurologist described her "as marked to extremely limited and symptomatic," and her social worker described her as "markedly limited and symptomatic," Dr. Cremerius found "it [] hard to understand how they come up with these restrictions." (Tr. 63). According to his reading of Plaintiff's records, Plaintiff's bipolar disorder, generalized anxiety disorder, and PTSD were stable and her symptoms were generally mild. (Tr. 63). Dr. Cremerius theorized that "these [medical professionals] are describing – not only psychological but physical [restrictions] as well . . . ."

Finally, a vocational expert testified at the hearing. (Tr. 69-75). The ALJ asked the vocational expert to consider a hypothetical individual with Plaintiff's age, education, and work

experience and the ability to: lift twenty pounds occasionally and ten pounds frequently; stand and/or walk six hours in an eight-hour work day; sit eight hours in an eight-hour work day; occasionally climb ramps and stairs; avoid climbing ladders, ropes, and scaffolds and working around unprotected height and machinery; occasionally stoop, kneel, crouch, and crawl; and perform simple and or repetitive work that did not require interaction with the public or co-workers. (Tr. 70-71). The vocational expert testified that such person could perform the jobs of laundry worker or machine tender. (Tr. 71). When the ALJ limited the hypothetical individual to lifting no more than ten pounds and standing or walking two hours in an eight-hour day, the vocational expert testified that he or she could perform sedentary table worker, assembly, or machine feeding jobs. (Tr. 72). However, the need to miss more than two days per month or arrive late, leave early, or take additional breaks at least once per week, would preclude competitive employment. (Tr. 73). The need to lie down twice a day for approximately thirty minutes would also preclude employment. (Id.).

In his decision of August 15, 2014, the ALJ applied the five-step evaluation set forth in 20 C.F.R. §§ 404.1520, 416.920[4] and found that Plaintiff "has not been under a disability, as defined in the Social Security Act, from February 13, 2013, through the date of this decision[.]" (Tr. 13-25). The ALJ found that Plaintiff had the following severe impairments: bipolar disorder, PTSD, personality disorder, fibromyalgia, migraine headaches, and seizure disorder. (Tr. 16).

---

[4] To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. §§ 404.1520, 416.920. Those steps require a claimant to show that he or she: (1) is not engaged in substantial gainful activity; (2) has a severe impairment or combination of impairments which significantly limits his or her physical or mental ability to do basic work activities or (3) has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) is unable to return to his or her past relevant work; and (5) the impairments prevent him or her from doing any other work. Id.

After reviewing the testimony and the medical records, the ALJ found that Plaintiff's "allegation that her impairments, either singly or in combination, produce symptoms and limitations of a severity to prevent all sustained work activity is not credible." (Tr. 21). The ALJ determined that Plaintiff had the residual functional capacity (RFC) to:

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except for lifting or carrying more than 20 pounds occasionally and 10 pounds frequently; standing or walking more than 6 hours in an 8-hour workday with normal work breaks; sitting more than 6 hours in an 8-hour workday; no climbing ladders, ropes, or scaffolds; climbing ramps or stairs, stooping, kneeling, crouching or crawling more than occasionally; avoid exposure to hazards (unprotected heights or dangerous machinery); and performing more than simple, routine tasks with no close interaction with the public or co-workers.

(Tr. 20). Finally, the ALJ found that Plaintiff was unable to perform any past relevant work but could perform other jobs that existed in significant numbers in the national economy. (Tr. 23-24).

Plaintiff filed a request for review of the ALJ's decision with the SSA Appeals Council, which denied review on January 5, 2016. (Tr. 1-6, 299-308). Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as the SSA's final decision. Sims v. Apfel, 530 U.S. 103, 106-07 (2000).

## II.     *Standard of Review*

A court must affirm an ALJ's decision if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); Buford v. Colvin, 824 F.3d 793, 795 (8th Cir. 2016). "Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the ALJ's determination." Buford, 824 F.3d at 795 (quoting Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005)). In determining whether the evidence is substantial, a court considers evidence that both supports and detracts from the

Commissioner's decision. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). However, a court "do[es] not reweigh the evidence presented to the ALJ and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reason and substantial evidence." Renstrue v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)).

"If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." Partee v. Astrue, 638 F.3d 860, 863 (8th Cir. 2011) (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). The Eighth Circuit has repeatedly held that a court should "defer heavily to the findings and conclusions" of the Social Security Administration. Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010); Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001).

## III.   Discussion

Plaintiff claims that substantial evidence does not support the ALJ's finding that she was not disabled because the ALJ failed to assign proper weight to the medical opinions of Plaintiff's primary care physician, neurologist, and social worker. (ECF No. 17). More specifically, Plaintiff argues that the opinions of these treating sources were entitled to controlling or, at least great, weight and the ALJ failed to provide "good reasons" for assigning them little weight. According to Plaintiff, had the ALJ properly credited their opinions regarding her physical and mental limitations, the ALJ would have found her disabled. The Commissioner counters that the ALJ assigned the medical opinion evidence proper weight and substantial evidence supported the ALJ's conclusion that Plaintiff was not disabled. (ECF No. 22).

### A.  Treating physicians

The Court first considers the weight that the ALJ assigned to the medical opinions of Plaintiff's treating physicians. A treating physician's opinion regarding a plaintiff's impairments is entitled to controlling weight where "the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000). Even if the opinion is not entitled to controlling weight, it should not ordinarily be disregarded and is entitled to substantial weight. Id. This rule is premised, at least in part, on the notion that the treating physician is usually more familiar with a claimant's medical condition than are other physicians. See 20 C.F.R. §§ 404.1527(c), 416.927(c); Thomas v. Sullivan, 928 F.2d 255, 259 n.3 (8th Cir.1991). "Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as [a] whole." Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007) (quotation omitted).

If an ALJ declines to give controlling weight to a treating physician's opinion, the ALJ must consider the following factors in determining the appropriate weight: length and frequency of the treatment relationship; nature and extent of the treatment relationship; evidence provided by the source in support of the opinion; consistency of the opinion with the record as a whole; and the source's level of specialization. 20 C.F.R. §§ 404.1527(c); 416.927(c). Whether the ALJ grants a treating physician's opinion substantial or little weight, "[t]he regulations require that the ALJ 'always give good reasons' for the weight afforded to a treating physician's evaluation." Reed v. Barnhart, 399 F.3d 917, 921 (8th Cir. 2005) (quoting 20 C.F.R. § 404.1527(d)(2)).

*1. Primary care physician*

In August 2010, Plaintiff presented to Dr. Stephen Nagy seeking a second opinion regarding her seizure disorder. (Tr. 570-72). At that visit, Dr. Nagy noted that Plaintiff was hit by a motor vehicle when she was eleven years old and that she currently suffered seizures approximately every six weeks. (Tr. 570-71). Dr. Nagy ordered an echocardiogram and MRI, referred Plaintiff to a neurologist, prescribed levothyroxine sodium, and advised Plaintiff to return in one month. (Tr. 572). Plaintiff's echocardiogram was "essentially normal" and the MRI of her brain was negative. (Tr. 574, 591).

After a seizure, Plaintiff followed up with a nurse practitioner in Dr. Nagy's office on September 21, 2010 and, on October 11, 2010, Plaintiff established care as Dr. Nagy's new patient. (Tr. 566-68). Plaintiff reported feeling depressed and complained that she was "occasionally still having seizures with stress and anxiety." (Tr. 566).

At a checkup in February 2011, Plaintiff complained of problems with balance, memory, and patience. (Tr. 563). At that time, Plaintiff was taking fluoxetine, Frova, Maxalt, Topiramate, Estradiol, and Lamictal. (Id.). Dr. Nagy completed a physical mental medical source statement (MSS) and a mental MSS for Plaintiff, noting that Plaintiff's physical abilities were significantly limited by "arm and leg discomfort" and "multiple sedating medications" and all areas of her mental and social functioning were "markedly limited" and "extremely limited." (Tr. 513-14, 516-17).

In August 2011, Plaintiff returned to Dr. Nagy's office for a checkup. (Tr. 558-59). Plaintiff wished to discuss the possibility of taking meloxicam for her back pain and reported that her mother "is setting up her medication because pt is missing doses." (Tr. 558). At Plaintiff's next appointment in December 2011, she reported a recent seizure and "that for the last couple of years, she has had diffuse myalgias and arthralgias." (Tr. 556). Plaintiff's

musculoskeletal exam was "normal except tender to palpation over the trapezius, thoracic and lumbar paraspinal areas without significant joint effusions or deformity." (Tr. 557). Dr. Nagy diagnosed Plaintiff with fibromyalgia and prescribed levothyroxine sodium. (Id.).

In January 2012, Plaintiff followed up with Dr. Nagy after a visit to urgent care for mid- and lower-abdominal pain. (Tr. 459-51). Plaintiff reported continued abdominal pain and worsening back pain. (Id.). Dr. Nagy prescribed omeprazole and ordered an ultrasound. (Tr. 551). Plaintiff followed up with Dr. Nagy's nurse practitioner in February 2012 and March 2012. (Tr. 333-34). At her appointment in March 2012, Plaintiff expressed concern about her "persistent generalized pain and fatigue from fibromyalgia" and informed the nurse practitioner that "[s]he wants to be placed on treatment for this." (Tr. 330-31). The nurse practitioner noted that Plaintiff suffered mild depression and prescribed Cymbalta.[5] (Id.).

Dr. Nagy examined Plaintiff in April 2012. (Tr. 328). Plaintiff reported that she had fallen twice in one week, and Dr. Nagy prescribed topiramate and Savella. (Tr. 329). In May 2012, Plaintiff saw Dr. Nagy for heart palpitations and frequent headaches. (Tr. 325-26).

Plaintiff presented to Dr. Nagy's office on September 7, 2012 with "pain in her RLQ for the last 2-3 weeks." (Tr. 322-23). She informed Dr. Nagy that she went to the ER on August 11, 2012, and "[h]er therapist told her she had a panic attack" but "[t]he ER physician diagnosed her with something 'viral.'" (Tr. 322). Dr. Nagy prescribed meloxicam. (Tr. 323). On September 17, 2012, Dr. Nagy ordered a Depo Medrol injection for Plaintiff's right hip. (Tr. 319).

Plaintiff saw a nurse practitioner in Dr. Nagy's office on December 4, 2012. Plaintiff reported suffering neck and shoulder pain since a fall three weeks before. (Tr. 316-17). The nurse practitioner noted "left mild decreased range of motion" and administered a Depo Medrol

_____

[5] Later that month, Plaintiff saw another healthcare provider at Jibben Medical where she discussed her fibromyalgia diagnosis and treatment options. (Tr. 311).

injection for neck pain. (Tr. 315, 316). She also prescribed Flexeril and ordered x-rays, which were normal. (Tr. 317). When Plaintiff followed up with Dr. Nagy about one week later, she complained of "diffuse myalgias." (Tr. 313-14).

At an appointment in March 2013, Dr. Nagy wrote that Plaintiff wished "to discuss her fibromyalgia treatment" and reported "a seizure 5 days ago," "increased pain in her back," and "more migraines recently." (Tr. 924). In his physical examination of Plaintiff, Dr. Nagy noted: "positive fatigue"; "positive diffuse myalgias and upper/lower back pain, with radiation to bilateral lower extremities"; "positive intermittent headaches, seizures, worsening memory, unsteady gait." (Tr. 924). Plaintiff's musculoskeletal examination revealed that she was "tender to palpation over the bilateral occipital area of skull, bilateral trapezius, bilateral pectoralis, bilateral lumbar paraspinal areas, bilateral trochanteric areas, bilateral deltoid areas, bilateral proximal things[.]" (Tr. 925).

On the day of the March 2013 examination, Dr. Nagy completed a physical MSS for Plaintiff. (Tr. 935-36). In the MSS, Dr. Nagy opined that Plaintiff could: lift and/or carry less than five pounds frequently and occasionally; stand and/or walk continuously less than fifteen minutes; stand and/or walk less than one hour in an eight-hour workday; sit continuously less than fifteen minutes; and sit less than one hour in an eight-hour workday. (Tr. 935). Dr. Nagy wrote that Plaintiff's ability to push and/or pull was limited "due to pain in back, upper and lower extremities, fatigue, generalized weakness." (id.). According to Dr. Nagy, Plaintiff could never climb, balance, stoop, kneel, crouch, crawl, reach, or handle, and could occasionally finger and feel. (Tr. 936). Finally, Dr. Nagy stated that Plaintiff's pain required her to lie down or recline for thirty to forty minutes every three hours and side effects of her medications included decreased concentration, persistence, and pace. (Id.).

In April 2013, Plaintiff presented to Dr. Nagy's office with right shoulder pain and swelling.  (Tr. 917).  X-rays of her right showed "minimal degenerative changes at the acromioclavicular joint" and "possible calcific tendonitis."  (Id.).  On August 13, 2013, Dr. Nagy examined Plaintiff for left hip pain, and x-rays revealed "very mild degenerative changes."  (Tr. 916).

Plaintiff returned to Dr. Nagy's office the following day with complaints of insomnia, and Dr. Nagy directed Plaintiff to wear an actigraphy watch and maintain a sleep diary.  (Tr. 915).  Plaintiff continued to complain of insomnia at follow-up appoints with Dr. Nagy on August 28, 2013 and in September, October, and November 2013.  (Tr. 906-13,).

In January 2014, Dr. Nagy completed for Plaintiff an MSS specific to fibromyalgia. (Tr. 772-73).  Dr. Nagy stated that Plaintiff suffered the following symptoms:  widespread pain for three or more months; pain in eleven or more pressure points; stiffness; irritable bowel syndrome; tension headaches; sensation of swollen hands; sleep disturbance; chronic fatigue; and memory loss.  (Tr. 773).  Dr. Nagy opined that Plaintiff could:  work zero hours per work day; stand fifteen minutes at a time; sit thirty minutes at a time; sit two hours and stand zero hours in a work day; never lift any weight, bend, or stoop; and occasionally raise her arms over shoulder level.  (Id.).

In February 2014, Plaintiff returned to Dr. Nagy for treatment of her insomnia and, in March 2014, she presented to Dr. Nagy's office with "persistent left thigh and inguinal pain." (Tr. 904-05, 944-45).  An MRI of Plaintiff's left hip was negative with a "small amount of fluid symmetrically at the hip joints, probably physiologic versus small effusion."  (Tr. 943).

On July 3, 2014, Dr. Nagy wrote a letter explaining his decision not to prescribe medication for Plaintiff's fibromyalgia.  (Tr. 1025).  Dr. Nagy stated:

> [Plaintiff] has a seizure disorder in addition to fibromyalgia. Her seizures have been well controlled on the current anticonvulsant regimen. I am reluctant to modify her treatment of fibromyalgia in any way with another anticonvulsant drug, such as Lyrica or Neurontin for treatment of fibromyalgia, because any change in the anticonvulsant regimen could place her at risk for further seizures.

(Id.).

In his decision, the ALJ assigned "no weight" to the mental MSS and physical MSS completed by Dr. Nagy in February 2011. (Tr. 22). The ALJ reasoned that "these remote opinions are not relevant to the period of disability in question" and were "deficient because they do not articulate an objective medical basis for the marked and extreme limitations indicated and are inconsistent with the conservative treatment rendered" and "the other objective medical evidence of record[.]" (Tr. 22).

The ALJ assigned "little weight" to Dr. Nagy's physical MSS of March 2013 and fibromyalgia MSS of January 2014. (Tr. 22). The ALJ specifically discredited Dr. Nagy's opinion that Plaintiff "could not perform even a significant limited range of sedentary exertional work activity." (Id.). The ALJ reasoned that the "paucity of clinical finding[s] on physical examinations (normal gait, stance range of motion, motor muscle strength, etc.) and minimal diagnostic findings, together with conservative treatment, inadequately support Dr. Nagy's medical source opinions." (Tr. 22-23).

As an initial matter, the Court finds that the ALJ's statement that Dr. Nagy's February 2011 mental and physical MSS's were "remote" and "not relevant to the period of disability in question" did not constitute "good reasons" for discounting those opinions. The Social Security regulations require an ALJ to consider *all* the medical opinions on record. See 20 C.F.R. § 404.1527(c)(2). Furthermore, the Eighth Circuit has held that, "[e]specially in the context of a progressive disease or degenerative condition, evidence that is offered as proof of a disability,

and not found persuasive by an ALJ in a prior proceeding, may be considered in a subsequent proceeding in combination with new evidence for the purpose of determining if the claimant has become disabled since the ALJ's previous decision." Hillier v. Soc. Sec. Admin., 486 F.3d 359, 365 (8th Cir. 2007). Given that Plaintiff complained of the same conditions from 2010 through the date of the ALJ's decision, medical opinions recorded by Plaintiff's doctors before the time period at issue in this case are not irrelevant.

Turning to the ALJ's decision to discredit Dr. Nagy's opinion due to a lack of objective medical evidence, the Eighth Circuit has long recognized that fibromyalgia is an elusive diagnosis, its "cause or causes are unknown, there's no cure, and, of greatest importance to disability law, its symptoms are entirely subjective." Tilley v. Astrue, 580 F.3d 675, 681 (8th Cir. 2009) (citation omitted). Importantly, the disease is chronic and "[d]iagnosis is usually made after eliminating other conditions, as there are no confirming diagnostic tests." Brosnahan v. Barnhart, 336 F.3d 671, 672 n. 1 (8th Cir. 2003). Accordingly, the absence of diagnostic findings did not constitute a "good reason" for discrediting Dr. Nagy's opinion regarding the limiting effects of Plaintiff's fibromyalgia.

Additionally, a review of the record reveals that, contrary to the ALJ's findings, Dr. Nagy's opinions were supported by physical examinations and objective medical evidence. Dr. Nagy began treating Plaintiff in October 2010, after which time Plaintiff consistently complained of generalized pain, frequent headaches, dizziness, fatigue, and depression. Plaintiff's musculoskeletal exams showed that she was "tender to palpitation" at numerous tender points, and x-rays in April 2013 and August 2013 revealed mild degenerative changes in her right shoulder and left hip. Contrary to the Commissioner's assertion, Plaintiff's consistent diagnoses by various treating sources of chronic pain, fibromyalgia, depression, headaches, and fatigue

over a period of years is objective evidence consistent with Dr. Nagy's opinion regarding her functional limitations. See Roster v. Colvin, No. 4:13-CV-2395 TIA, 2015 WL 402079, at *19 (E.D.Mo. Jan. 28, 2015).

In regard to the ALJ's finding that Plaintiff's conservative treatment undermined her claim of disability, the Court notes that Plaintiff periodically inquired about alternative treatments for her fibromyalgia, even apparently seeking a second opinion in March 2012. Furthermore, Dr. Nagy explained in his July 2014 letter that he did not pursue other treatments for fear of disrupting her successful anticonvulsant regimen. Given Dr. Nagy's reason for conservatively treating Plaintiff's fibromyalgia, Plaintiff's conservative treatment history did not undermine her allegations of disabling limitations.

Under the framework provided by the regulations, Dr. Nagy's opinion was entitled to controlling weight. Dr. Nagy was Plaintiff's primary care provider and the sole physician monitoring and treating her fibromyalgia. Dr. Nagy began treating Plaintiff in October 2010, and either Dr. Nagy or his nurse practitioner examined Plaintiff over twenty-five times over the next three and a half years. See 20 C.F.R. §§ 404.1527(c)(2)(i), 416.927(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."). Other record evidence, such as Dr. Godbey's treatment notes and Plaintiff's counseling notes, were consistent with Dr. Nagy's opinion. Based on the above, the Court finds that the ALJ failed to properly weigh Dr. Nagy's opinions and thus failed to properly assess Plaintiff's disability claim such that substantial evidence does not support the ALJ's determination. See, e.g., Gordon v. Astrue, 801 F.Supp.2d 846, 859 (E.D.Mo. 2011).

*2. Treating neurologist*

At Dr. Nagy's referral, Plaintiff first went to Dr. Godbey for treatment of her seizures and headaches in September 2010. (Tr. 396-98). At the first examination, Dr. Godbey noted that Plaintiff: suffered a head injury when she was eleven years old; began having seizures at age nineteen; experienced two types of seizures – loss of consciousness with eyelid fluttering and "staring spells"; and felt "confused and lethargic" for a day or two after each seizure. (Tr. 396). Plaintiff also reported: fatigue; diminished hearing; chest pain, palpitations, and lightheadedness; dyspnea; constipation and diarrhea; low back pain; and depression, stress, and difficulty concentrating. (Tr. 397). Dr. Godbey ordered an EEG, decreased Plaintiff's Topamax, and prescribed Keppra. (Tr. 398).

Plaintiff followed up with Dr. Godbey approximately two weeks later. (Tr. 393-95). Dr. Godbey noted that, Plaintiff was "moving slowly and is still tearful" and "experienc[ing] worsening migraines and more frequent seizures." (Tr. 393). Dr. Godbey continued Plaintiff's Topamax and Keppra and prescribed Lamictal. (Tr. 394). One week later, Plaintiff returned to Dr. Godbey's with a headache diary showing no severe migraines and no seizures or syncopal events. (Tr. 594-97). Dr. Godbey diagnosed Plaintiff with "generalized convulsive epilepsy (mild; improving)" and "common migraine (mild)." (Tr. 596).

At a follow-up appointment in November 2010, Plaintiff reported that, since her last visit, she had suffered six migraines that lasted up to two days and two possible seizures. (Tr. 390-92). Plaintiff reported: fatigue, myalgias, anxiety, and crying spells. (Tr. 390). Dr. Godbey increased Plaintiff's Lamictal and continued her Keppra and Topamax. (Tr. 392).

In January 2011, Plaintiff reported four migraines that responded to medication, "one episode of dreaming she had a seizure and woke up the next day with soreness and lethargy," and feeling "more depressed with poor concentration, coping skills, hypersomnolence, and poor

appetite." (Tr. 387). Plaintiff informed Dr. Godbey that she was on a waitlist to see a psychiatrist. (Id.).

Plaintiff returned to Dr. Godbey's office in April 2011 and reported continued depression, poor concentration and appetite, fatigue, anhedonia, and hypersomnia. (Tr. 384-86). Dr. Godbey directed Plaintiff to obtain another referral for a psychiatrist and continued her medications. (Tr. 385-86). Dr. Godbey also completed a mental MSS for Plaintiff, in which he stated that Plaintiff was: markedly or extremely limited in all areas of understanding and memory, sustained concentration and persistence, and ability to adapt; and moderately or markedly limited in all areas of social interaction. (Tr. 519-20).

In July 2011, Plaintiff presented to Dr. Godbey's office with "well controlled migraines without aura and seizures." (Tr. 382). Since her last visit, Plaintiff "had 1 migraine that lasted 2 days and no seizures." (Tr. 381). Plaintiff continued to struggle with fatigue and depression. (Tr. 381-82). At Plaintiff's follow-up appointment in November 2011, she reported one seizure and one migraine and exhibited a flat affect. (Tr. 378-80).

In April 2012, Plaintiff brought Dr. Godbey her headache diary, which showed she had three migraines and two "syncopal spells" since her last appointment. (Tr. 375-78). Dr. Godbey noted that Dr. Nagy had diagnosed Plaintiff with fibromyalgia, bipolar disorder, and irritable bowel syndrome. (Tr. 375). At her follow-up visit in September 2012, Plaintiff informed Dr. Godbey that, since her last appointment, she had no severe migraines, four milder headaches, and no seizures or syncopal events. (Tr. 372).

Plaintiff returned to Dr. Godbey's office for a follow-up appointment in March 2013. (Tr. 368-70). Since her last visit, Plaintiff had "5 severe migraines that last about a day, which is an improvement from 3 days and her headaches are less severe" and "no seizures or syncopal

events." (Tr. 368). Plaintiff was positive for: fatigue; diarrhea, constipation, and abdominal pain; headaches; and depression. (Id.). In October 2013, Plaintiff reported an "all over body pain" at a level of six out of ten, functional limitations including housework and yard work, dizziness, continued headaches, and three severe migraines. (Tr. 763).

In April 2014, Plaintiff reported level five "all over body pain," functional limitations, dizziness, diminished hearing, anxiety, and depression. (Tr. 982-85). Given Plaintiff's "problems with side effects on Topamax," Dr. Godbey prescribed Trokendi XR. (Tr. 984). The following day, Dr. Godbey completed a migraine questionnaire for Plaintiff, stating that she experienced one migraine per month lasting between twenty-four and forty-eight hours. (Tr. 1014). Dr. Godbey wrote that Plaintiff was compliant with her medication and "has had improvement on her migraines but still continues to have about 1 severe breakthrough migraine per month." (Tr. 1014). Dr. Godbey opined that Plaintiff was not able to function in a work setting because "[s]he must take a rescue medication that causes extreme lethargy. She also frequently has nausea, and extreme sensitivity to light + sound causing 'foggy' thought process." (Id.).

In his decision, the ALJ assigned "no weight" to Dr. Godbey's mental MSS of April 2011, reasoning that "remote opinions are not relevant to the period of disability in question." (Tr. 22). The ALJ further found that the MSS: was "deficient because [it did] not articulate an objective medical basis for the marked and extreme limitations"; was inconsistent with the conservative treatment rendered and the record as a whole; and "appear[ed] to be based on the claimant's subjective complaints, rather than on independent medical findings." (Tr. 22). The ALJ gave Dr. Godbey's April 2014 migraine questionnaire "little weight" because he found that

Dr. Godbey's statement that Plaintiff had migraines once a month was "inconsistent with his treatment records, indicating migraines of a frequency of less than one a month." (Tr. 23).

As an initial matter, the Court again notes that evidence presented in support of a prior claim may be relevant to a claim of disability with a later onset date. Burks-Marshall v. Shalala, 7 F.3d 1346, 1348 n. 6 (8th Cir. 1993). Indeed, medical evidence that pre-dates the period of disability in question may be considered as "background for new and additional evidence of deteriorating mental or physical conditions occurring after the prior proceeding." Mabry v. Colvin, 815 F.3d 386, 390 (8th Cir. 2016) (quoting Hillier, 486 F.3d at 365). Accordingly, the fact that Dr. Godbey completed the April 2011 mental MSS two years prior to the time period at issue in this case is not a "good reason" for discounting it.

The ALJ's other reasons for discounting Dr. Godbey's April 2011 mental MSS – namely, conservative treatment and lack of objective medical evidence – were similarly conclusory and unsupported by the record. Significantly, the ALJ neither provided examples of "objective medical evidence" nor identified the type of "independent medical findings" needed to support Dr. Godbey's opinion regarding the debilitating effects of Plaintiff's mental impairments. Furthermore, while the ALJ faults Plaintiff's conservative treatment, the record reflects that Dr. Godbey regularly adjusted Plaintiff's medications and repeatedly referred Plaintiff to psychiatrists.

Contrary to the ALJ's findings, Dr. Godbey's 2011 mental MSS was consistent with the evidence of record. Dr. Nagy treated Plaintiff regularly over the same period of time as Dr. Godbey and consistently noted Plaintiff's migraines, headaches, seizures, generalized pain, fatigue, and depression. Furthermore, the record reflects that Plaintiff received regular and long-term mental health treatment, in the form of medicine management and individual and group

therapy, from May 2011 through April 2014. In further support of Dr. Godbey's opined mental limitations, the record reflects that Plaintiff presented to the emergency room with: anxiety-induced chest pain in August 2012 and January 2013; an overdose of her sleep medication in June 2013; and suicidal ideations, for which she was hospitalized for two days, in April 2014.

In regard to Dr. Godbey's migraine questionnaire of April 2014, the ALJ correctly observed that, contrary to his statement in the questionnaire, Dr. Godbey's treatment notes reflected that Plaintiff did not suffer one migraine headache per month. According to Dr. Godbey's notes from 2013, Plaintiff suffered five migraines between September 2012 and March 2013 and three migraines between March 2013 and October 2013.

While Dr. Godbey might have overstated the frequency of Plaintiff's migraines in the migraine questionnaire, his statements regarding the severity of Plaintiff's migraines and side effects of her medication were consistent with the record. Dr. Godbey and Dr. Nagy, as well as Plaintiff's social worker and mental health nurse practitioner, consistently noted Plaintiff's complaints of lethargy, nausea, and "fibro fog."

Based on the Court's review of the record, the Court holds that the ALJ failed to properly consider the factors set forth in 20 C.F.R. §§ 404.1527 and 416.927, which, taken together, suggest that Dr. Godbey's opinions were entitled to substantial, if not controlling, weight. As a neurologist, Dr. Godbey was a specialist who had been treating Plaintiff for three and a half years. During that time, Dr. Godbey examined Plaintiff at least twice a year, and he noted the same symptoms and diagnoses as Plaintiff's primary care physician, Dr. Nagy. Dr. Godbey's assessment of Plaintiff's mental impairments was also consistent with that of Plaintiff's treating social worker, Ms. Pierce. Based on the above, the Court finds that substantial evidence did not support the ALJ's decision to give Dr. Godbey's opinions little and no weight.

*B.  Other Medical Source*

Finally, Plaintiff claims the ALJ erred in assigning "very little weight" to the opinion of her social worker, Roxanne Pierce, LCSW.  (ECF No. 17).  More specifically, Plaintiff asserts that, even though Ms. Pierce was not an "acceptable medical source" for purposes of establishing a medical impairment, it was appropriate for the ALJ to consider her opinion when determining the severity of Plaintiff's impairments.  The Commissioner counters that Ms. Pierce was not an "acceptable medical source" and her opinion was inconsistent with evidence indicating that Plaintiff's mental condition was generally stable.  (ECF No. 22).

Only "acceptable medical sources" may establish the existence of a medically determinable impairment, provide a medical opinion, or be considered a treating source entitled to controlling weight.  Social Security Ruling 06-03P, 2006 WL 2329939 at *1 (2006).  In regard to mental health impairments, only licensed physicians or certified psychologists are considered "acceptable medical sources."  Id.  Other medical sources include nurse practitioners, physician assistants, social workers, and therapists.  See 20 C.F.R. §§ 404.1513(a), 416.913(a); Lacroix v. Barnhart, 465 F.3d 881, 886 (8th Cir. 2006).  While these other sources cannot establish the existence of a medically determinable impairment, information from such sources "may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function."  SSR 06-03P at *2.  See also Nowling v. Colvin, 813 F.3d 1110, 1123-24 (8th Cir. 2016).

Ms. Pierce provided Plaintiff individual counseling twice a month from August 2011 to April 2014.  (Tr. 724-25).  In addition, Plaintiff attended Ms. Pierce's group therapy sessions about twice a month between September 2012 and April 2014.[6]  In her treatment notes, Ms.

_____

[6] During this time, Plaintiff was also saw Debra Price, APMHNP for medication management about once a month.  Ms. Price diagnosed Plaintiff with bipolar disorder, depression, generalized

Pierce consistently recorded Plaintiff's complaints of depression, mood swings, low energy, anxiety, difficulty sleeping, poor concentration, memory problems, panic attacks, crying spells, flashbacks of sexual abuse, anger issues, physical pain, and GAF scores of 45 or 50. (Tr. 420, 428-29, 481-82, 489-90, 696-97, 717-18, 830-31, 886-87, 890-91,900-01, 991-92). Not only were Ms. Pierce's assessments of Plaintiff's mental health consistent with the observations of Drs. Nagy and Godbey, they were also consistent with those of Debra Price, APMHNP, who met with Plaintiff regularly and managed Plaintiff's mental health medications.[7]

Ms. Pierce is an "other medical source" whose opinion the ALJ is to consider when assessing the severity of an impairment and how it affects the ability to work. 20 C.F.R. §§ 404.1513(a), 416.913(a). In light of the extensive treatment history between Plaintiff and Ms. Pierce, and the consistency between Ms. Pierce's treatment records and those of Drs. Nagy and Godbey,[8] the ALJ erred in disregarding Ms. Pierce's opinion. See, e.g., Nowling, 813 F.3d at 1124.

## IV. Conclusion

For the reasons stated above, the Court finds that the ALJ erred in discounting the opinions of Plaintiff's primary care physician, neurologist, and social worker. The

---

anxiety disorder, and post-traumatic stress disorder (Tr. 743, variously prescribed Plaintiff Seroquel, fluoxetine, and Vistaril. (Tr. 438, 743, 708, 995).

[7] Debra Price met with Plaintiff once a month from May through December 2011 and once every month or every two months from January 2012 through April 2014. (Tr. 399-401, 405-07, 422-25, 436-38, 447-49, 463-66, 475-78, 485-88, 493-96, 501-03, 698-70, 705-07, 712-14, 719-21, 728-30, 734-36, 740-42, 782-84, 809-12, 837-40, 855-58, 863-65, 872-75, 893-96, 987-90, 994-96, 1000-03).

[8] The Commissioner acknowledges that Ms. Pierce's MSS was consistent with the opinions of Drs. Nagy and Godbey, arguing: "[L]ike the similar mental limitations set forth in the remote MSSM forms signed by Drs. Nagy and Godbey, Ms. Pierce's suggestion that Plaintiff was markedly or extremely limited in almost all aspects of mental functioning was inconsistent with the overall record[.]" (ECF No. 22 at 14).

Commissioner's decision is reversed and remanded for an appropriate analysis of the medical opinion evidence. Accordingly,

**IT IS HEREBY ORDERED** that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner is **REVERSED**, and this cause is **REMANDED** to the Commissioner for further proceedings consistent with this opinion.

An order of remand shall accompany this memorandum and order.

PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 24th day of August, 2017